# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

KEVIN ROBERT SMITH,

        Defendant-Appellant.

UNPUBLISHED
August 14, 2018

No. 334692
Ingham Circuit Court
LC No. 15-001023-FC

Before: CAMERON, P.J., and METER and BORRELLO, JJ.

PER CURIAM.

Defendant appeals as of right his convictions by a jury of criminal sexual conduct in the first degree, MCL 750.520b (CSC-I), and second degree, MCL 750.520c (CSC-II). The trial arose from allegations that he sexually assaulted his cousins, the twins DG and KG, when they were children; the two convictions involved incidents with DG.[1] The trial court sentenced defendant to concurrent prison terms of 180 to 270 months for the CSC-I conviction and 71 to 180 months for the CSC-II conviction. We affirm.

## I. ASSISTANCE OF COUNSEL

Defendant argues that he received ineffective assistance of counsel in several respects. Whether a defendant received the effective assistance of counsel is a mixed question of fact and law. *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). This Court reviews for clear error the trial court's findings of fact and reviews de novo questions of constitutional law. *Id*. To establish ineffective assistance of counsel, a defendant must show: (1) that counsel's performance was below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's error or errors, the result of the proceedings would have been different. *Id*. at 51. This Court will not substitute its judgment for that of counsel regarding matters of trial strategy. *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009).

---

[1] The jury acquitted defendant concerning an alleged incident involving KG and could not reach a verdict regarding a third alleged incident involving DG.

-1-

## A. FAILURE TO OBJECT

The gist of defendant's initial ineffective-assistance claim is that the prosecutor used improper testimony from Detective Annie Harrison, Dr. Stephen Guertin, and various other witnesses to vouch for the credibility of the complainants' accusations and that counsel should have objected to the testimony. "It is generally improper for a witness to comment or provide an opinion on the credibility of another witness, because credibility matters are to be determined by the jury." *People v Dobek*, 274 Mich App 58, 71; 732 NW2d 546 (2007). "An expert may not vouch for the veracity of a victim." *Id*.

## 1. ANNIE HARRISON

### a. THE FORENSIC INTERVIEW

Defendant contends that Harrison improperly vouched for the complainants' credibility when "she told the jury that her 'job is to thoroughly investigate and determine if [the case] should or shouldn't be forwarded to the prosecutor's office for review.'" Defendant insists that "[t]he jury had no choice but to conclude that Harrison's 'thorough investigation' resulted in a determination of [defendant's] guilt, otherwise they would not be in court." Defendant suggests that Harrison's "insistence that her interview technique is scientific and research-based and that she had received extensive training" in how to conduct the forensic interview "exacerbated" the prejudice stemming from the alleged vouching. This argument is meritless.

In *Dobek, id*., this Court observed that a detective "testified about his background and experience, the manner in which to properly investigate and interview subjects in criminal sexual conduct cases, his interview of the victim and her demeanor, and delayed disclosure in criminal sexual conduct cases." This Court had no problem with the detective's testimony about these subjects; it was the defendant's cross-examination about deception issues that arguably crossed the line. *Id*. Moreover, the Court in *Dobek* noted:

> Given that [the detective] was called as a witness by the prosecutor and that a criminal prosecution against defendant was pursued, the jurors surely understood that [the detective] believed that the victim was telling the truth even without the disputed testimony. [*Id*.]

That the detective who investigated the case and presented it to the prosecutor is testifying for the prosecution at a trial concerning the subject of the investigation is a clear indication that the detective believes in the validity of the charges. The detective is not barred from testifying; what trial courts must do, however, is carefully ensure that detectives (or other witnesses) are not allowed to act as human lie detectors and testify that, in their opinions, the complainant is being truthful.

Harrison testified that she had received specialized training in conducting interviews in child-sexual-abuse cases. She explained that the majority of cases she investigated involved delayed disclosure, with the delay being "a few days or it could be a few weeks or years." This did not constitute vouching for the complainants' credibility; the testimony said nothing about the truth or falsity of the sisters' statements. Harrison described the nature of a forensic

interview of a sexual-abuse victim: "The goal for a forensic interview is to obtain a statement from a child in an unbiased developmentally appropriate neutral way"; the State of Michigan had developed the protocol for this type of interview "to help us as [everyday] professionals on the do's and don'ts of how to interview a child, what the best practice is." Harrison further explained that the goal of the interview was to avoid misunderstandings and to have the children describe their story in their own words, without the interviewer being suggestive. Harrison noted that one of the ways of ensuring that the interview elicited a statement of the subject's own recitation of events is for the interviewer to construct alternative hypotheses. Harrison explained that this was important because "[t]here can't be any misunderstandings. We need to make sure that we are getting the allegations correct, that we're looking to see what other possibilities are. We want to minimize suggestibility."

The questioning enabled Harrison to determine that the complainants were insisting that defendant had actually committed intentional sexual assaults on them. Harrison's unbiased questioning might have enabled her to determine that the complainants were lying or mistaken— for example, their accounts might have been internally inconsistent or inconsistent with known facts or with the laws of sexual assault. That this evidence of lying or mistake did not materialize does not mean that Harrison determined that what the complainants told her was true, nor did she suggest to the jury that this was the case; instead, she specifically noted that it merely meant she would continue her investigation rather than terminate the inquiry. Contrary to defendant's claim, Harrison was not permitted to offer testimony concerning her evaluation of the complainants' claims. When the prosecutor asked Harrison, "And were you able to eliminate any of the hypotheses or come to any conclusions?" defense counsel objected and the prosecutor withdrew the question. Considered in context, Harrison's testimony indicated that she had determined from the interview that the complainants' statements did not represent misunderstandings or outright lies, not that the statements were necessarily true. Moreover, as previously noted, the jurors would already have assumed that Harrison believed the allegations because she took them to the prosecutor, who in turn filed the charges that they were considering at the trial. *Id*. We find no ineffective assistance with regard to this aspect of Harrison's testimony.

### b. FURTHER INVESTIGATION

Defendant claims that Harrison's statement that she interviewed 28 witnesses constituted vouching because she found these witnesses by asking the sisters whom they told or who might know about the incidents. This statement does not in any way constitute vouching; it merely indicates that Harrison obtained and followed investigative leads. The statement does not detail what the witnesses told Harrison or whether Harrison believed what the witnesses told her. In short, there is nothing about this statement that vouches for the complainants.

Evidently to support this claim, defendant quotes a lengthy portion of Harrison's testimony that includes her descriptions of how she checked out some details of DG's statements. Defendant asserts that the lengthy quotation "is replete with both improper hearsay and improper vouching" and that "[t]he amount of improper testimony by Harrison is astounding . . . ." MRE 801(c) provides that " '[h]earsay' is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." To the extent that any of Harrison's testimony referred to statements of DG,

the statements were not submitted to prove their truth (e.g., that shirts were kept in a particular closet), but to show that Harrison's investigation of DG's claims did not outright disprove those claims, and thus required Harrison to continue her investigation. At any rate, most of the testimony recited by defendant concerned proper and allowable visual observations by Harrison, indicating how she attempted to determine if the claims should continue to be investigated. Seeking and finding corroborating evidence is not equivalent to vouching for a witness's credibility.[2] Defendant's claim regarding the content of the quoted passage is meritless.[3]

### c. QUALIFICATION AS AN EXPERT

Defendant next contends that Harrison was allowed to offer expert opinions despite not having been qualified as an expert. However, it is clear that had the prosecutor sought such qualification, Harrison would have been qualified. MRE 702 provides that an individual can be qualified as an expert "by knowledge, skill, experience, training, or education[.]" Based on her testimony regarding her background and training, Harrison would qualify as an expert. Defense counsel was not ineffective for failing to object.

### d. SPECIFIC CASELAW

Defendant contends that Harrison's testimony was improper based on *People v Peterson*, 450 Mich 349; 537 NW2d 857, amended 450 Mich 1212 (1995), and *People v Shaw*, 315 Mich

---

[2] As discussed *infra*, unlike the investigator in *People v Shaw*, 315 Mich App 668, 676; 892 NW2d 15 (2016), Harrison did not state that she "was able to confirm the veracity of [the complainant's] statements . . . ."

[3] The trial court concluded that even if Harrison made some improper statements, defendant failed to demonstrate prejudice from her testimony because there was physical evidence consistent with sexual abuse and there were family members who testified that they had witnessed defendant behaving inappropriately with the complainants. Defendant contends that the trial court erred in making these conclusions. Defendant states that there was "absolutely no physical evidence showing sexual abuse" and that Dr. Guertin had found that "his physical findings could have come from abuse or volitional sexual intercourse." However, the fact that the physical findings *could* have come from sexual abuse in fact *supports* the trial court's finding. Defendant next embarks on a lengthy examination of what certain witnesses had described about defendant's conduct. He emphasizes that most of the witnesses only became concerned about defendant's conduct when the complainants' allegations came to light, or alleged that they were concerned about his conduct at the time it occurred but did not bother to report it to authorities or directly confront DG or KG about it. However, in the context of sexual abuse by a family member, it may be that other family members are disinclined to think ill of the perpetrator. Also, they might be disinclined to report inappropriate behavior because they do not want to accuse a family member or cause problems within the family. That this is a valid concern can be seen from what happened to the family relationships following the revelation of DG's and KG's claims.

App 668; 892 NW2d 15 (2016).[4] The statements defendant finds objectionable in connection with this caselaw involve Harrison's testimony that the majority of the cases she investigates involve delayed disclosure, that sexual-abuse victims frequently remember more details after their initial interviews, and that it is normal for sexual-abuse victims to skim over specific facts. Defendant claims that Harrison's "lengthy recitation of the 'truth seeking' process" was improper because "it invaded the purview of the jury and improperly vouched for the complainants." However, Harrison did not claim that DG's or KG's recitation of events was truthful or even credible; she merely explained that, based on her experience, other sexual-abuse victims behaved just like other crime victims: they sometimes made delayed disclosure of their accusations, they remembered additional details as time went by, and they sometimes skimmed over facts. In *Peterson*, 450 Mich at 373, the Court stated: "We hold that the prosecution may present evidence, if relevant and helpful, to generally explain the common postincident behavior of children who are victims of sexual abuse." The complaints highlighted by defendant concern a witness's explanation of "common postincident behavior of children who [were allegedly] victims of sexual abuse"; therefore, Harrison's testimony was proper under *Peterson*. The improper testimony in *Peterson* concerned experts' testimony concerning statistics related to the *veracity* of child-sexual-abuse victims. *Id*. at 375-376. The Court concluded: "Such references to *truthfulness* as [sic] go beyond that which is allowed under MRE 702." *Id.* at 376 (emphasis added). Harrison's testimony did not involve "references to truthfulness" and did not suggest that correspondence between the complainants' claims and what occurred in other sexual-abuse cases established the veracity of the complainants' assertions.[5]

In *People v Shaw*, 315 Mich App 668, 676; 892 NW2d 15 (2016), this Court found error in testimony by the investigating officer that contained hearsay, and that also asserted she was able to "confirm the veracity" of the events related by the complainant and "corroborate[]" what

---

[4] We decline to address the nonbinding, unpublished case also cited by defendant.

[5] Defendant acknowledges that this Court in *Dobek* held that police officers were allowed to provide lay opinion testimony; specifically, with respect to the police officer in *Dobek*, this Court ruled that (1) it could reasonably be argued that the officer's testimony was acceptable lay opinion testimony; and (2) assuming expert testimony was required, the officer "was more than qualified to give expert opinion testimony on delayed disclosure to the extent of the testimony actually presented." *Dobek*, 274 Mich App at 78-79. The main thing that the officer testified to was that "delayed disclosure is common and happens quite frequently with child victims." *Id*. at 79. Harrison testified to the same conclusion based on her experience, and defendant now claims that that was "vouching." Defendant additionally asserts, however, that Harrison also "testified to many psychological aspects for which she had no training," such as the remembering of more details after the initial interview and "skimming" over facts of the crime. Without explaining why, defendant insists that "[t]here can be no doubt that this testimony was improper." But Harrison's observations were not "psychological." She was testifying to her own observations from investigating many child-sexual-abuse cases. These observations are not unusual; indeed, it is not unusual for witnesses to remember additional details or skim over some facts that are subsequently developed more completely in a later interview or even at trial.

-5-

the complainant told her. The Court stated that the officer had essentially informed the jury that she had "concluded that the complainant was credible[.]" *Id*. This Court found no tactical advantage for the defense attorney in not objecting and concluded that counsel's failure to object fell below an objective standard of reasonableness. *Id*. at 676-677.

While the prosecutor in the present case did ask Harrison about certain "ways to corroborate statements" that Harrison followed, Harrison's testimony did not go as far as the investigator's statements in *Shaw*, wherein the investigator stated that she "confirm[ed] the veracity" of certain statements by comparing them with inadmissible hearsay. See *id*. at 676. In addition, Harrison specifically testified that she did not conclude at the end of the interviews that the complainants had been abused but instead concluded that further investigation was needed. Moreover, defense counsel specifically elicited hearsay testimony from Harrison during cross-examination by either including hearsay statements in his questions or by asking her to relate what she had been told by the complainants or by other witnesses. This was in line with the defense strategy of highlighting inconsistencies in the complainants' stories. This case is therefore unlike *Shaw* and we do not find *Shaw* to require reversal.[6]

## 2. DR. STEPHEN GUERTIN

Defendant contends that his trial attorney should have objected to the testimony of Dr. Guertin because he provided inadmissible hearsay testimony when he recounted statements made to him by KG and DG and testified about a diagnosis of sexual molestation.[7]

The prosecutor claims that MRE 803(4)—the medical diagnosis or treatment hearsay exception—applies to the testimony about the complainants' statements. MRE 803(4) excepts the following:

> Statements made for purposes of medical treatment or medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception of general character of the cause or external source thereof insofar as reasonably necessary to such diagnosis and treatment.

---

[6] We also note that *Shaw* was issued on June 14, 2016, the very day of Harrison's testimony, and as such it would be difficult to hold counsel responsible for failing to object on the basis of *Shaw*.

[7] By using quotation marks, defendant suggests that Dr. Guertin's examinations of KG and DG were not "medical examinations." However, defendant does not explain how a physical examination of a woman's vagina by a doctor following her claim of sexual abuse is not a medical examination. Similarly, defendant sets off the words "medical history" with quotation marks to suggest, again without explanation, that a doctor conducting an interview of an individual who has presented for a physical examination concerning claims of sexual abuse is not obtaining a medical history. In fact, Dr. Guertin testified that "[s]ince it's a doctor doing it, it is a medical history."

-6-

In *People v Mahone*, 294 Mich App 208, 214-215; 816 NW2d 436 (2011), this Court stated:

> Statements made for the purpose of medical treatment are admissible pursuant to MRE 803(4) if they were reasonably necessary for diagnosis and treatment and if the declarant had a self-interested motivation to be truthful in order to receive proper medical care. This is true irrespective of whether the declarant sustained any immediately apparent physical injury. Particularly in cases of sexual assault, in which the injuries might be latent, such as contracting sexually transmitted diseases or psychological in nature, and thus not necessarily physically manifested at all, a victim's complete history and a recitation of the totality of the circumstances of the assault are properly considered to be statements made for medical treatment. Thus, statements the victim made to the nurse were all properly admissible pursuant to MRE 803(4). [Citations omitted.]

The statements were admissible if one looks to *Mahone*. While the Court in *Shaw*, 315 Mich App at 675, found MRE 803(4) inapplicable because the examination in that case occurred "seven years after the last alleged instance of abuse," because the complainant "was specifically referred to Guertin[8] by the police,"[9] and because "during the seven years since the last alleged incident of abuse, she had seen a different physician . . . for gynecological care," the *Shaw* opinion was not issued until June 14, 2016, and Dr. Guertin provided his testimony on June 7, 2016. Accordingly, it did not fall below an objective standard of reasonableness for counsel to fail to object on the basis of *Shaw*. At any rate, even assuming the availability and applicability of *Shaw* and thus even assuming that counsel erred by failing to object to Dr. Guertin's testimony, we cannot find a basis for reversal.

At the commencement of cross-examination, the following detailed exchange occurred:

*Q*. [Defense counsel]: When you say the findings were consistent with either one, either one what?

*A*. [Dr. Guertin]: It wasn't either child. It was—you can clearly get these injuries with a painful sexual molestation encounter that entailed bleeding, especially if it was in the pre-pubertal period. You can also get these findings from consensual sex, especially recurrent consensual sex.

*Q*. All right. Thank you, Doctor. Doctor, in the history that you obtained with these two young ladies, is the sole source of the history from these girls themselves?

*A*. Absolutely.

---

[8] *Shaw* also involved testimony by Dr. Guertin.

[9] There was evidence in the present case of a police referral to Dr. Guertin.

*Q.* I mean, you don't review any police reports or prior statements or anything like that?

*A.* No. In fact, again, they are put to the side. I don't think I, even in this folder, I have such a thing.

*Q.* All right. And when you indicate in your conclusion that—I think in one of their conclusions you indicated a strong history of sexual abuse?

*A.* Right. [KG] was a strong history. And with [DG] I said a clear history.

*Q. And that's based on what they tell you?*

*A. It's based on what they say, right.* Level of detail. And the fact that—

*Q. You don't try to analyze whether what they're saying is accurate, or whether it's inconsistent, you base that conclusion on what they had told you?*

*A. Right. I can't tell you if they were telling me the truth.*

*Q.* All right.

*A.* But they said certain things, things that they said could certainly cause injury. And they had injury, so . . .

*Q. And, of course, back to the first question I asked you: Those injuries, as well, could be caused by volitional sexual—*

*A. They could.* [Italics and underlining added.]

Defense counsel's cross-examination placed Dr. Guertin's testimony in context. Although Dr. Guertin used words like "clearly" and "strong" to describe the history he obtained from the complainants, he confirmed that he was using these terms to indicate the level of detail they related.

Further, the trial court instructed the jury that although Dr. Guertin was an expert,

*[Y]ou do not have to believe an expert's opinion.* Instead, you should decide whether you believe it and how important you think it is.

When you decide whether you believe an expert's opinion, think carefully about the reasons and facts he gave for his opinion, and whether those facts are true.

You should also think about the expert's qualifications, and whether his opinion makes sense when you think about the other evidence in the case.

You heard Dr. Guertin render a conclusion that [DG] and [KG] were sexually abused. *That evidence cannot be used to show that the crimes charged were committed, or that the Defendant committed them, nor can it be considered an opinion by Doctor Guertin that [DG] and [KG] are telling the truth.*

You, as jurors, are the sole judges of the facts and the credibility of the witnesses. And you should base your decision on all the evidence presented in the case.

You heard Doctor Guertin's opinion about the behavior of sexually abused children. You should consider that evidence only for the limited purpose of deciding whether [DG] and/or [KG]'s acts and words after the alleged crime were consistent with those of sexually abused children. The evidence cannot be used to show that the crime charged here was committed, or that the Defendant committed it, *nor can it be considered an opinion by Doctor Guertin that [DG] or [KG] are telling the truth*. [Emphasis added.]

"Jurors are presumed to follow their instructions, and it is presumed that instructions cure most errors." *Mahone*, 294 Mich App at 212. It is apparent that in this case the jurors followed their instructions because they acquitted defendant of the only charge based on [KG]'s testimony, and they were unable to agree regarding a verdict for the final charge (the CSC-II charge related to defendant's allegedly forcing [DG] to touch his penis). Had the jurors unquestioningly accepted Dr. Guertin's testimony, they would have found defendant guilty of all four counts; instead, the jurors followed their instructions and only convicted defendant on the two counts for which they found sufficient evidence.

Given the clarification on cross-examination that Dr. Guertin's testimony was based on DG's and KG's statements, given the jury instructions, and given that DG and KG testified at trial about the incidents in question, we cannot find that any error in the admission of Dr. Guertin's testimony affected the outcome of the trial.[10]

### 3. OTHER WITNESSES

Defendant claims that the complainants' father and grandmother,[11] as well as witnesses RG, SF, AG, and SK, were all permitted to relate hearsay statements in light of trial counsel's

---

[10] Defendant takes issue with Dr. Guertin's diagnosis of sexual abuse. But again, Dr. Guertin specifically stated: "I can't tell you if they were telling me the truth," and admitted that if he obtained an inaccurate history, that could result in a false diagnosis. In addition, Dr. Guertin's opinions properly were based in part on his physical examinations. See *People v Smith*, 425 Mich 98, 112; 387 NW2d 814 (1986). He explained that pre-pubertal penetration is more likely to leave notches in the hymen than post-pubertal penetration.

[11] For ease of reference, the complainants' mother, father, and grandmother will be referred to in this opinion as "Mother," "Father," and "Grandmother."

failure to object, and that this cumulative hearsay prejudiced defendant to the degree that, absent the hearsay, the outcome of the trial would have been different.

### a. FATHER

Father testified:

> *A.* Correct. We have always talked about it ["things" Mother had made him aware of]. She always has never been comfortable with the way that Kevin has ever been around any girl that has been in our family that's young. She has made mention for 15, 20 years. She had never liked it. There was something there. *She said: I just can't put my finger on it.* I always thought to myself, maybe you're overreacting.

> Mr. Hocking [Defense Counsel]: I am going to object. I don't know that his thoughts on the subject are relevant.

> The Court: It's his thoughts. I'll overrule the objection. It's his thoughts. So I'll allow the answer.

> *Q.* (Mr. Kwasnik [Ass't Prosecutor]): Go ahead [and] finish your answer. What did you think?

> *A.* It was just—that was what my knowledge of the situation was. It was always the way my wife reacted to the things that she had seen, you know. I worked a lot, so I wasn't around as much as she was when we owned the store and stuff like that.

> So, yes, firsthand situations that I was not present at. I only know from what she had told me due to *general conversations at dinner or anything like that.* [Emphasis added.]

Defendant claims that Father's statements as quoted above were hearsay because he testified that Mother told him about a number of incidents involving [DG] and defendant. Even assuming that this nonspecific testimony constituted inadmissible hearsay, we cannot find anything outcome-determinative in it because the testimony essentially indicates that Mother had no evidence from which to conclude that defendant had done something inappropriate; she simply felt uncomfortable with defendant's interactions. This admission supported defendant's claim of innocence, i.e., that the sexual-assault allegations were based on lies from [DG] and [KG] and the resultant misunderstanding of the adults; in other words, he had not actually sexually assaulted either complainant, but his general behavior with them had caused some of the adults to feel uncomfortable. Moreover, on cross-examination, Father agreed that the allegations

against defendant had "caught [him] off guard" because he never expected his cousin to molest his children. This statement supported the defense.[12]

## b. GRANDMOTHER

Defendant claims that Grandmother testified that Mother told her about an incident that occurred between [DG] and defendant at a pond. Defendant *does not specify* the hearsay he claims was related or explain how Grandmother's testimony constituted impermissible vouching for the credibility of [DG] or [KG]. Defendant cannot simply announce his position and leave it to this Court to find and rationalize the basis for the claim. *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998). At any rate, after examining the cited transcript page, we find that Grandmother was describing what *she* observed at the pond, i.e., that [DG] and defendant were "sitting close together" and "needed to separate a little bit." While she also related that "[Mother] was concerned that they were sitting too close together," this was simply a reiteration of Grandmother's own statement that she observed the two close together and that they needed to separate. In addition, Grandmother testified that she "didn't think anything was really going on." This comment actually assisted the defense by emphasizing that an adult did not see any criminal conduct occurring. Defense counsel was not ineffective for failing to object to this exchange.

## c. RG

Defendant claims that RG provided multiple hearsay statements. He states that RG "testified that [Mother] sat her down at a party and explained that she felt that [defendant] had acted inappropriately with the girls over several years." This is a misreading of the cited transcript page. RG actually testified that Mother "had mentioned some things that had bothered her over the years that she had noticed [defendant] doing . . . ." This *nonspecific* testimony was not particularly consequential and defense counsel was not ineffective for failing to object to it. Defendant also claims that RG "testified that [Mother] was vocal about not liking [defendant]." Defendant does not cite a transcript page for this allegation, and we refuse to do defendant's legwork for him. *Id*. Defendant next takes issue with the following exchange during RG's testimony:

> *A*. . . . So it caught Jason's attention. Jason brought it up to me and he said, what was that about. I said, I have no idea what's going on. This was a different instance at the pond. So it was around the time that they were 13. I think it [was] around the time that it may have stopped.
>
> That was another instance in the pond someplace where Jason was really uncomfortable with it. He said: I don't like it. Don't have a good feeling about it. Something is wrong. He's doing something and it's just not right. He's like: Something needs to be done.

---

[12] Defendant also claims that Father provided hearsay when he stated that he "wasn't there on some of the other circumstances." Defendant does not explain, however, how this statement constitutes hearsay when Father did not elaborate on anything another person told him.

So he was getting a bad vibe off of it as well. I was like: I don't know what you want me to say, or who you want me to say it to. Do you want me to say it to [Father]? Do you want me to say it to [Mother]? Do you want me to approach the girls?

*Q.* What did you do?

*A.* I asked the girls about it. They were like: No, it's fine . . . . We have got it under control. Left it at that. So—

*Q.* You did have a conversation with the girls that you remember?

*A.* We touched on it a little bit. But neither one wanted to talk about it. So I kind of just left it at that and let it be.

Contrary to defendant's implication, it is not clear from the transcript whether RG also observed the incident being referred to by "Jason," but she did provide some hearsay when she discussed Jason's stating, "[h]e's doing something and it's just not right." However, RG did not relate anything that specifically described defendant's conduct, and the concluding statement was that DG and KG appeared to discount the importance of the incident. This supported the defense. It indicated that nothing serious enough to merit a complaint had occurred. In these circumstances, we find no ineffective assistance of counsel in the failure to object.

d. SF

Defendant claims that SF improperly testified about a social-media post from DG. Defendant asserts that SF "testified that the post explained that [DG] had been sexually assaulted." Defendant does not set forth support for this claim. Here is what SF actually testified to:

*Q.* When did you first become aware—you know [why] you're here, correct?

*A.* Yes.

*Q.* When did you first become aware that there was a potential problem?

*A.* I had just happened to have a break at work, and opened my Facebook. And I see [DG] have [sic] a posting.

*Q.* Okay. So there was something about that posting that made you watch?

*A.* She never said any names. But she kind of made an accusation about something that had happened to her.

*Q.* It bothered you enough to do some follow-up; is that right?

*A*. It bothered me enough to show my co-worker, am I seeing what I think I am seeing.

*Q*. Then what did you do?

*A*. I texted her twin.

*Q*. You texted her twin?

*A*. I texted [KG] and asked if her sister was okay.

*Q*. All right.  And did you do anything else?

*A*. Not that day.  She texted her and was like, she is okay.

*Q*. All right.

*A*. Later I did text [KG] and said, is she okay.  She said yeah.

While this testimony contains some hearsay, the nature of it is inconsequential.  SF did not relate what DG posted on her Facebook page other than to say that she made an accusation about something that happened to her; SF did not explain what that accusation was.  Contrary to defendant's claim, SF did not testify that [DG] made a social media post claiming *sexual assault*. The testimony contains hearsay from KG stating that DG is "okay."  Defendant does not explain how this hearsay was prejudicial.  In fact, it supported the defense that nothing had happened, and that DG and KG were making up their allegations, because even if the post on Facebook did claim that DG was sexually assaulted, KG assured SF that DG was okay, which is inconsistent with her having been assaulted.  This testimony aided the defense in arguing that DG's testimony about being sexually abused was not credible.  In cross-examining DG, counsel pointed out inconsistencies in DG's social-media postings.  Counsel was not ineffective for failing to object

Defendant next claims that SF repeated hearsay in testifying about conversations she had with DG at a party.  Defendant fails to disclose that SF was twice instructed by the prosecutor to confine her comments to what she observed and not to testify to what DG had said.  Also, defense counsel objected when SF began to describe what DG was upset about, and her testimony on this point was *cut off*.  SF then testified that she had conversations with DG, but she did not in fact relate the content of the conversations.

Defendant claims that SF related hearsay statements in describing what transpired when she entered the kitchen in Mother's home, when Mother became extremely angry against defendant.  But Mother had already testified about this episode, so SF's testimony did not disclose anything new to the jury.  Contrary to defendant's assertion that "[t]his inappropriate testimony served to substantiate the claim that [defendant] was guilty of these alleged crimes," this testimony did not substantiate anything other than Mother's reaction to DG's disclosures. The jurors were well aware that the disclosures had been made because DG testified about them. Defendant has failed to show any outcome-determinative prejudice based on counsel's failure to object.

### e. AG

Defendant next argues that AG provided hearsay testimony by stating that DG and KG had told her about some of defendant's actions. But AG, while providing a brief hearsay statement in this regard, also clearly testified about *personally seeing* defendant do the same things (trying to "grab" areas on the girls). In these circumstances, there was no prejudice arising from the hearsay. Defendant also argues that AG provided hearsay testimony by stating that the complainants told her about texting defendant to tell him to stop. But the prosecutor himself immediately admonished AG to only testify about "things that you saw with your own eyes." Counsel was not ineffective for failing to raise an objection when the prosecutor himself corrected the witness.

### f. SK

Defendant next protests that DG's boyfriend, SK, was allowed to testify without objection that DG told him years before trial that defendant had sexually assaulted her when she was younger. However, MRE 801(d)(1) states that a prior statement of a witness is not hearsay if:

> The declarant testifies at the trial court hearing and is subject to cross-examination concerning the statement, and the statement is . . . (B) consistent with the declarant's testimony and is offered to rebut an express or implied charged against the declarant of recent fabrication or improper influence or motive . . . .

SK's testimony fit within this rule because defense counsel argued in opening statements that the complainants recently fabricated these charges. Counsel was not ineffective for failing to object.

Contrary to defendant's allegation, the circumstances and testimony in this case are different from those at issue in *Shaw*, 315 Mich App at 673-674, and we find no basis to reverse based on defense counsel's failure to object to the various instances of alleged hearsay.

### B. FAILURE TO PRESENT WITNESSES

### 1. ALTERNATIVE SOURCE OF INJURIES

Defendant argues that counsel should have presented evidence of an alternative source of DG's injuries, specifically, the testimony of two other men with whom [DG] had been sexually active. This Court in *People v Russell*, 297 Mich App 707, 716; 825 NW2d 623 (2012), stated:

> Decisions regarding whether to call or question witnesses are presumed to be matters of trial strategy. [T]he failure to call witnesses only constitutes ineffective assistance of counsel if it deprives the defendant of a substantial defense. Similarly, [t]he failure to make an adequate investigation is ineffective assistance of counsel if it undermines confidence in the trial's outcome. [*People v Russell*, 297 Mich App 707, 716; 825 NW2d 623 (2012) (quotation marks and citations omitted).]

MCL 750.520j(1) provides:

> (1) Evidence of specific instances of the victim's sexual conduct, opinion evidence of the victim's sexual conduct, and reputation evidence of the victim's sexual conduct shall not be admitted under [MCL 750.520b to MCL 750.520g] unless and only to the extent that the judge finds that the following proposed evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value:
>
> (a) Evidence of the victim's past sexual conduct with the actor.
>
> (b) Evidence of specific instances of sexual activity showing the source or origin of semen, pregnancy, or disease.

Here, Dr. Guertin readily admitted that DG was sexually active and that her notched hymen could have resulted from consensual sex. Given this testimony and the limits set forth in the above statute, we find no ineffective assistance of counsel with respect to this issue.[13]

## 2. TESTIMONY OF BW

Defendant also claims that trial counsel was ineffective for failing to present the testimony of BW, the complainants' great-grandmother and defendant's grandmother. According to BW's affidavit, DG's claim that defendant assaulted her at BW's house while BW was asleep was false because defendant and DG were never at her house without Mother, Father, or Grandmother being present.[14]

The prosecutor notes, as did the trial court, that RG testified that defendant was BW's favored grandchild. This fact, along with BW's admission that she suffers from Alzheimer's disease, would have undercut Wade's testimony. DG maintained that she *was* present at RW's house without Mother, Father, or Grandmother. In light of RW's possible bias and her Alzheimer's disease, we cannot find any ineffective assistance of counsel with respect to the failure to call BW as a witness to attempt to rebut this statement by DG.

---

[13] In *Shaw*, 315 Mich App 668, 681 n 8; 892 NW2d 15 (2016), the Court concluded that two brief references to the fact that the complainant had had consensual sex "were unlikely to provide the jury a basis to conclude that the complainant was in a sexually active relationship before Guertin's examination." Here, by contrast, there was not simply a reference to DG's having had consensual sex at some point; Dr. Guertin specifically acknowledged multiple times that DG reported being "sexually active" to him and he explained that this sexual activity could have resulted in the hymenal changes.

[14] BW also provided a statement about her dog's barking habit but defendant does not make an issue of this in his appellate brief.

We find no ineffective assistance of counsel with respect to any of defendant's claims and reject his claim of cumulative error.

## II. ADMISSION OF DR. GUERTIN'S TESTIMONY

### A. QUALIFICATION AS AN EXPERT

Defendant argues that Dr. Guertin should not have been qualified as an expert. However, defense counsel explicitly stated that he had "[n]o objection" to Dr. Guertin's being qualified as "an expert in the field of sexual abuse against children." Thus, defendant affirmatively waived any objection to Dr. Guertin's qualifications and may not now raise the issue on appeal. *People Kowalski*, 489 Mich 488, 503-505; 803 NW2d 200 (2011); *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000).

### B. AREA OF EXPERTISE

Defendant also argues that Dr. Guertin testified outside his area of expertise when he addressed psychological and memory issues and examined the complainants as adults. We review this unpreserved issue for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

Because defendant did not challenge Dr. Guertin's credentials as a child-sexual-abuse expert, he has not established that testimony pertaining to such psychological and memory issues, or pertaining to the physical makeup of adults sexually abused earlier in life, is outside the expertise of a medical doctor qualified by training and experience with working with sexually-abused children. MRE 702 specifically provides that "a witness [may be] qualified as an expert by knowledge, skill, experience, training, or education . . . ." A pediatric doctor who has spent a substantial portion of his time dealing with sexually abused children for over 30 years could, by experience and training, be an expert concerning psychological and memory issues that are routinely encountered when working with sexually abused children and concerning how earlier sexual abuse could affect physical structures later in life. Defendant has simply failed to demonstrate that this was *not* the case and thus has not demonstrated any clear or obvious error. *Id*.

### C. OTHER ALLEGATIONS

Defendant attacks the hypothetical that Dr. Guertin used at one point in his testimony and claims it "mimicked the very facts of this case and allowed for more improper vouching." However, there is nothing in Dr. Guertin's response that vouches for DG's or KG's statements. And defendant ignores that Dr. Guertin explained that his only bases for evaluation were the statements he obtained from the sisters and his physical examinations. He specifically stated: "I can't tell you if they were telling me the truth," and admitted that if he obtained an inaccurate history, that could result in a false diagnosis. He largely reiterated these precepts later in his testimony. These caveats serve to countermand defendant's argument that Dr. Guertin

improperly opined regarding the ultimate issues in the case.[15] Defendant claims that Dr. Guertin improperly vouched for DG when he testified that sexually abused children remember things that are vivid, and that DG accordingly remembered digital penetration because "[it] clearly made an impression on her." This remark was not, contrary to defendant's assertion, "a pediatric medical doctor[] pontificat[ing] about his opinions on an adult women's memories and how they made her feel." It was the opinion of an expert in child sexual abuse concerning why a sexual-abuse victim might remember certain details very clearly while not recalling other details.

Defendant contends that Dr. Guertin's testimony about the results of the physical examination was not necessary. He argues that "the medical evidence did nothing to help the jury determine a fact in issue." Defendant contends that this is so because Dr. Guertin was unable to determine with certainty whether the sisters' physical injuries were from sexual abuse or consensual sexual intercourse, and therefore the testimony was irrelevant. However, this ignores that one of the facts at issue was whether there was evidence to support a claim of penetration, which is an element of the two counts charging CSC-I. MCL 750.520b. Therefore, medical testimony that confirmed that there had been penetration was very relevant. That the penetration could have been from consensual sex does not render the testimony irrelevant; it affects the weight but not the admissibility of the testimony. Further, in light of its relevance to an element of the charged offenses, we reject the argument that MRE 403 mandated exclusion of the testimony.

### III. LIFETIME ELECTRONIC MONITORING

Defendant contends that the imposition of lifetime electronic monitoring (LEM) on him by the trial court constituted an unreasonable search and also constituted cruel or unusual punishment. We review constitutional questions de novo. *People v Benton*, 294 Mich App 191, 195; 817 NW2d 599 (2011).

In *People v Hallak*, 310 Mich App 555, 577, 579; 873 NW2d 811 (2015), rev'd in part on other grounds 499 Mich 879 (2016), this Court considered and rejected the defendant's claims that LEM is an unreasonable search and that it violates the constitutional prohibition against cruel or unusual punishment. Defendant has failed to present any cogent argument in support of his claim that we can distinguish *Hallak* to arrive at a different conclusion.

With regard to defendant's claim that there is nothing in the record to support the conclusion that defendant presents the kind of lifetime threat to society that the defendant in *Hallak* presented, the trial court disagreed. The trial court stated:

> Defendant also argues the facts of the present case are different because, as opposed to the 13 victims in *Hallak*, there was only one victim in this case; thus, lifetime electronic monitoring as applied to Defendant is unconstitutional. The Court finds this claim to be equally without merit. In the case at bar,

---

[15] In addition, as noted in footnote 10, Dr. Guertin's opinions properly were based in part on his physical examinations. See *People v Smith*, 425 Mich 98, 112; 387 NW2d 814 (1986).

Defendant was accused of sexually abusing his two young cousins since they were young children and continuing to do so into their teen years. There was also evidence presented at trial that Defendant frequently preyed on other young females who were either part of the family or close family friends. While Defendant was only convicted of CSC 1st and 2nd against [DG], the evidence presented at trial, of both charged and uncharged conduct, strongly indicated that Defendant had a history of inappropriate sexual activity, for a number of years, involving several victims. In addition, [DG] testified that the reason she decided to come forward with the allegations was because she believed Defendant was "going after" another little girl . . . who was six years old and autistic. Defendant's behavior was persistent and ongoing, and based on the testimony at trial, he clearly demonstrated a strong interest in young girls to which he had constant access. As a result, "when employing an as-applied standard" under the specific facts of this case, lifetime electronic monitoring as part of Defendant's sentence was neither cruel, nor unusual.

The trial court's recitation accurately reflects the evidence presented at trial and in fact understates that evidence. DG, KG, and AG testified regarding defendant's inappropriate sexual conduct with them, and AA testified regarding defendant's request for provocative photographs. As the trial court noted, DG also related her concerns regarding defendant's contact with a young autistic girl. The LEM imposition was appropriate.

Affirmed.

/s/ Thomas C. Cameron
/s/ Patrick M. Meter

-18-