*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JASON BRENT KEISTER,

        Defendant-Appellant.

UNPUBLISHED
October 29, 2020

No. 340931
Van Buren Circuit Court
LC No. 2016-020783-FC

ON REMAND

Before: GLEICHER, P.J., and RONAYNE KRAUSE and O'BRIEN, JJ.

PER CURIAM.

Defendant's appeal from his convictions by a jury of first-degree criminal sexual conduct, MCL 750.520b(2)(b) (defendant over the age of 17 and victim under the age of 13), and second-degree criminal sexual conduct, MCL 750.520(c)(1)(a) (victim under the age of 13), returns to this Court from our Supreme Court. We again affirm.

## I. BACKGROUND

We will not repeat the background facts already set forth in our prior opinion. We previously rejected defendant's hearsay challenges to certain testimony; and we also rejected his argument that testimony from Gloria Gillespie, a therapist who specialized in counseling sexually abused children, constituted improper vouching. Our Supreme Court denied leave as to all of those arguments. Instead, our Supreme Court determined that testimony from Dr. Angela May, a pediatrician who examined the victim four weeks after her initial disclosure of abuse, "was plainly contrary to *People v Smith*, 425 Mich 98[; 387 NW2d 814] (1986), *People v Peterson*, 450 Mich 349[; 537 NW2d 857] (1995), and *People v Thorpe*, 504 Mich 230[; 934 NW2d 693] (2019)." Having found Dr. May's testimony to constitute error, our Supreme Court remanded to this Court to determine whether "whether the prejudice prong of the plain-error test was satisfied, and, if so, whether reversal of the defendant's convictions is warranted. *People v Carines*, 460 Mich 750, 763-764[; 597 NW2d 130] (1999)."

We observe that the prosecutor specifically asked our Supreme Court to clarify whether it really intended for this Court to consider the testimony of Dr. May, as opposed to the testimony of Gillespie. In response, our Supreme Court clarified that this Court should specifically address only our "holding that the admission of testimony from Dr. Angela May that 'there was a high likelihood of abuse' was not plain error." We therefore understand our Supreme Court to have left intact our prior opinion in all other respects, including our holdings that no error occurred in the admission of any other witnesses' testimonies and that Dr. May's testimony did not constitute improper hearsay. Although we did not actually use the phrase "high likelihood of abuse," Dr. May did use that phrase at one point during her testimony. Thus, it appears that the only error identified by our Supreme Court was in the following paragraph from our prior opinion:

Although defendant does not clearly present this argument, it appears that defendant also contends that Dr. May's testimony constituted improper vouching for the victim's veracity or an improper opinion about whether defendant was actually guilty. Again, defendant provides very little supporting argument. *Mitcham*[ v *City of Detroit*], 355 Mich [182,] 203[; 94 NW2d 388 (1959)]. Nevertheless, we note that although expert witnesses may not render a legal conclusion about whether a particular crime was committed, it is perfectly proper for an expert to "testify to the facts relevant to the applicable legal principles" or provide an opinion within the scope of their expertise that happens to coincide with an ultimate issue. *People v Drossart*, 99 Mich App 66, 75, 77, 79-82; 297 NW2d 863 (1980). Furthermore, although an expert may not directly vouch for a victim's truthfulness, an expert may render an opinion about whether objective evidence found by the expert is consistent with a fact at issue. *People v James*, 182 Mich App 295, 297-298; 451 NW2d 611 (1990). We are unpersuaded that Dr. May's testimony was improper.

Peremptory orders from our Supreme Court are binding to the extent they can be comprehended, even if only by reference to other opinions, including unpublished opinions. *Woodring v Phoenix*, 325 Mich App 108, 115; 923 NW2d 607 (2018). Our Supreme Court's order obviates whether defendant adequately presented any challenge to Dr. May's testimony.[1] We understand our remit to be limited to determining whether the portion of Dr. May's testimony that our Supreme Court considers improper vouching constituted prejudice warranting reversal. We finally infer from our Supreme Court's order that the admission of testimony in violation of *Smith*, *Peterson*, and *Thorpe* is not *per se* prejudicial and does not *per se* require reversal.

## II. ADDITIONAL RECORD EVIDENCE

In relevant part, Dr. May testified as follows:

---

[1] As we alluded to previously, during Dr. May's testimony, the only objection defendant raised was to the admission of a report prepared by Dr. May, based on Dr. May's lack of involvement with the process of storing records at the hospital and lack of knowledge as to which of three possible social workers conducted an interview with the victim. Defendant did not argue on appeal that admission of the report, specifically, was error.

-2-

*Q.* Okay. What was your understanding of the sexual abuse that occurred to [the victim]?

*A.* So the allegations that she had made or the disclosure rather that she had made was regarding digital genital which means the perpetrator's hand to her genital area, genital digital which refers to the child's hand being compelled to touch the perpetrator's genitals and then there was also disclosed genital oral contact so the child being compelled to put their mouth on the perpetrator's genitals.

*Q.* What was your overall assessment after the examination of [the victim]?

*A.* So factors in my overall assessment included the statements that she had made disclosing abuse and what type or what types of contact were involved as well as, you know, statements she had made in the past about that -- about that as well and then, you know, having looked at her genital area, having done a thorough evaluation head to toe examination, having done testing for sexually transmitted infections, after that was all complete I did find that -- I did find that there was a high likelihood of abuse to [the victim].

The prosecutor then concluded direct examination.

On cross-examination, the following exchanges occurred:

*Q.* [. . .] [N]ow the diagnosis you made in that report -- and I am referring you to page -- well -- I don't know if they are numbered -- your second report that has at the bottom of it diagnosis, do you see that?

*A.* Correct. Yep, I see it.

*Q.* And in fact that says normal anal genital examination findings, correct?

*A.* Correct.

*Q.* And what you wrote in that report is probable pediatric sexual abuse?

*A.* Correct.

*Q.* Not highly likely, not what you just testified today. What your opinion was in writing was probable --

*A.* Sure.

*Q.* -- pediatric sexual abuse?

*A.* Sure.

*Q.* And it is correct, ma'am, is it not that your determination is not based on any physical findings you saw, it is based on what has been reported to you that [the victim] said?

*A.* My evaluation and diagnosis -- for one thing this was two years ago and so more than -- about two and half years ago now, the practice style and the practice recommendations at the time dictated that there were a set guidelines that were in use by physicians who were practicing child abuse medicine. The guidelines --

*Q.* Okay. Slow down --

*A.* Sure.

*Q.* Because I think my question was pretty specific. There was nothing in the physical findings that supported your diagnosis, correct? Yes or no?

*A.* I found no -- I found no abnormal findings in her genital area or her butt.

*Q.* Your diagnosis is based on histories that you were provided, correct?

*A.* My diagnosis was based on both the history and physical components as well as testing.

*Q.* Ma'am -- okay, but there were no physical components, correct?

*A.* I could not make a diagnosis based on history alone. I had to have that entire evaluation.

*Q.* Okay. You can't make it based on history alone, but yet you had a history?

*A.* Yes.

*Q.* And you did an examination --

*A.* Yes.

*Q.* -- and you found nothing to support the history, correct? Correct?

*A.* It was --

*Q.* Physically the examination --

*A.* Nor was it needed. [. . . .] There were no physical findings as far as abnormal findings in the genital area or the butt.

On further cross-examination, Dr. May admitted that she did not personally take a history from or interview the victim; and she did not know which of three possible social workers had conducted an interview with the victim, nor could any of those social workers remember who interviewed the victim. Dr. May's testimony was unclear whether she reviewed the victim's forensic interview at the time she prepared her report. Dr. May explained that she did not believe "probable" meant "fifty-fifty," but she agreed that it meant "more likely than not."

On redirect examination, Dr. May further explained that "probable" was derived from guidelines categorized into "no clear medical indication of abuse at this time, possible, probable and definite." She stated that "you were hearing me say higher likelihood rather than using the word probable because I want to make it descriptive rather than make a diagnosis." On recross examination, she further explained that she had been "trying to convey [her] assessment in plain language as possible," and she agreed that there was a "small" possibility of non-abuse.

III. ANALYSIS

With respect to our dissenting colleague, we do not believe that our Supreme Court would have wasted valuable resources sending this matter back to this Court if Dr. May's testimony was as obviously prejudicial as our dissenting colleague appears to find, or if the admission of Dr. May's testimony was *per se* prejudicial purely because it constituted improper vouching. We trust that our Supreme Court did, in fact, actually review the record and give it careful consideration before arriving at its decision in this matter. As our dissenting colleague aptly observes, our "Supreme Court had no difficulty concluding that the plainly erroneous admission of the expert's opinion testimony affected Harbison's substantial rights, necessitating a new trial." Thus, our Supreme Court clearly could have done so here. Thus, we decline to start our analysis with the presumption that Dr. May's testimony was, in fact, so unfairly prejudicial as to require reversal; nor do we start with the presumption that the instant matter is obviously indistinguishable from *Thorpe* or *Harbison*. Instead, we continue to respect the traditional presumption that an evidentiary error *is* harmless, and the appealing party has the burden of persuading the reviewing court that the error undermined the reliability of the verdict after considering the rest of the evidence properly admitted. See *People v Whittaker*, 465 Mich 422, 426-427; 635 NW2d 687 (2001).

From Dr. May's testimony as a whole, the jury would have been keenly aware that, in fact, she had no basis for her diagnosis other than what the victim said. Indeed, Dr. May became obviously evasive when asked whether she had any physical basis for her diagnosis. Nonetheless, our Supreme Court has indicated that even if the jury knows that an expert is simply relying on a victim's statements, the expert nevertheless improperly vouches for the victim by making a probability assessment on the basis of the victim's statements. *Thorpe*, 504 Mich at 250, 260-266. Thus, pediatricians in child sexual assault or abuse cases are not permitted to present their diagnoses to the jury except in the rare situation in which there is obvious physical evidence underlying that diagnosis. However, admission of a pediatrician's diagnosis is not automatically so prejudicial as to require reversal.

During closing argument, the prosecutor referenced Dr. May's testimony only once, pointing out that a sexual abuse victim would not be expected to have any injuries and stating that Dr. May's "overall assessment was probable pediatric sexual abuse" based on the victim's consistency in her various statements. The prosecutor did so in the context of arguing that the victim had consistently described what had happened to her on numerous occasions. Defendant emphasized during oral argument that the victim's "consistency" was based in large part on statements she purportedly made to an "unknown non-witness forensic interviewer" and an "unknown, not presented social worker." He also emphasized that "the doctor" provided nothing of value other than her own belief in the victim, and that the jury should make its own assessment

-5-

of whom to believe. The trial court instructed the jury that it was not obligated to believe experts' opinions, and it should consider the basis for any such opinion.

Juries are presumed to follow their instructions. *People v Bruner*, 501 Mich 220, 228; 912 NW2d 514 (2018). That presumption can be overcome under some circumstances, such as the admission of evidence too powerful for a jury to put out of mind without meaningful substantive rebuttal. *Id*. at 229-230, citing *Bruton v US*, 391 US 123, 137; 88 S Ct 1620; 20 L Ed 2d 476 (1968). Nevertheless, juries are also presumed to be capable of assessing an expert's testimony "in light of all the evidence submitted at trial." *People v Kowalski*, 492 Mich 106, 130; 821 NW2d 14 (2012). We have more faith than does our dissenting colleague in the jury's ability to think for itself whether an expert should simply be blindly believed purely because words came out of the mouth of someone with fancy letters after their name. Furthermore, as noted, testimony of Dr. May's diagnosis is not prejudice mandating reversal *per se*. Our dissenting colleague accurately observes that we have rules of evidence that prevent the jury from hearing some evidence. However, our dissenting colleague fails to appreciate that admissibility is *not* at issue before us, because our Supreme Court has already made that determination. Rather, our remit is explicitly limited to only prejudice, and evidentiary errors are typically *not* grounds for automatic reversal. Again, if reversal was necessary simply because Dr. May's testimony was erroneous, there would be no need to analyze whether it was actually prejudicial, and our Supreme Court would not have remanded the matter to us.

We thus take note of some additional context tending to suggest that Dr. May's diagnosis was insufficiently overwhelming to satisfy the "the prejudice prong of the plain-error test." Of great importance, comments made during closing argument indicate that the jury was powerfully moved by the victim's own testimony. As our dissenting colleague observes, during closing argument, defense counsel stated:

> I want to touch on the idea of this reasonable doubt. I talked about no second thoughts and it is hard, I know, some of you were very emotional when [the victim] testified. I hope you would be. I am not saying it is easy for her, I am not saying she is a manipulative little person who is just out to get somebody, I am saying she is a child.

The fact that we have an actual record revealing that the jury was strongly influenced by the victim's testimony partially obviates the need to speculate as to the relative effect of Dr. May's testimony. Our dissenting colleague draws the conclusion that the jury being so clearly moved by the victim's testimony that defense counsel felt the need to comment upon it is irrelevant and has no bearing on whether Dr. May's testimony undermined the reliability of the verdict. That is precisely the opposite of the correct standard: the prejudicial effect of improperly admitted evidence should be considered "in light of the weight and strength of the untainted evidence." *Whittaker*, 465 Mich at 427 (quotation omitted). The effect of the victim's own testimony is therefore highly significant to whether Dr. May's testimony was prejudicial *in addition to* being improper.

Furthermore, Dr. May was simply one out of several individuals who corroborated what the victim had said, and the jury was aware that her diagnosis was based entirely on her assessment of the consistency of the victim's statements. For example, the victim's mother testified that the

victim "has always stuck with her story" notwithstanding the mother's efforts to impress upon the victim the seriousness of the matter. The fact that the victim may have disclosed different aspects of the assaults to her mother and to a friend would be unsurprising, given Gillespie's testimony that sexual abuse victims often have difficulty describing details of their assaults. The victim's mother also recalled the victim's demeanor changing over the preceding few months, describing the victim as becoming "upset." She also noted that the victim had become more emotional and began having breakdowns, one of which required the victim to go to the emergency room. Defendant admitted to a police officer that the victim had seen him watching pornography on a tablet, corroborating her testimony that the two watched pornography together. Furthermore, there were other credibility discrepancies for the trier of fact to resolve: defendant testified that on the evening before the victim made her disclosure to her mother, the victim had simulated performing oral sex with a hot dog. The victim's mother corroborated that testimony, but the victim's friend, who had been present that evening, contradicted that testimony. In other words, this case does not present a simple one-on-one credibility contest between defendant and the victim.

Dr. May had also been impeached by vigorous and competent cross-examination drawing out serious deficiencies in the basis for her diagnosis, such as the fact that she did not personally interview the victim and did not even know who did, internal inconsistency in how she described her diagnosis, and her obvious evasiveness when asked about what evidence—if any—underlay her diagnosis. Thus, the jury was aware that the victim's consistency was of critical concern, and it was well-situated to make its own determination of just how consistent her statements had actually been. We are unable to follow our dissenting colleague's logic for concluding that the jury would somehow give *more* weight to Dr. May's testimony after being informed that Dr. May had less of an opportunity to observe the victim than had the jury itself. We presume the jury followed their instructions and weighed the credibility of each witness as directed when reaching their verdict.

## IV. CONCLUSION

We conclude that on this record, Dr. May's diagnosis was unlikely to have had such an overwhelming effect on the jury—especially compared to the victim's own testimony and in light of the other witnesses and the obvious weaknesses brought out in the rest of Dr. May's testimony—that it affected the outcome of the proceedings. We therefore conclude that its admission did not so unfairly prejudice defendant as to require reversal. Affirmed.

/s/ Amy Ronayne Krause
/s/ Colleen A. O'Brien

-7-